**IN THE U.S. DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**DANIEL VEST,**
individually and on behalf of all others similarly situated,

Plaintiff,

v.

**DRAFTKINGS, INC.,**

Defendant.

Civil Action No. ______________________

**CLASS ACTION COMPLAINT**

Plaintiff Daniel Vest, by and through his undersigned counsel, brings this Class Action Complaint (the "Complaint") against Defendant DraftKings, Inc. ("DraftKings" or "DK"), and alleges as follows based upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

1. In this day and age, it is indisputable that, broadly speaking, artificial intelligence ("AI") has both positive, helpful and negative, deleterious applications.

2. For example, while AI may be used to help medical professionals and/or other perform certain tasks, it also may be used to "manipulate consumer perception."[1] "[A]ccording to

---

[1] "How AI Could Potentially Manipulate Consumers," *Duke Fuqua School of Business*, https://www.fuqua.duke.edu/duke-fuqua-insights/how-ai-could-potentially-manipulate-consumers (last visited Sept. 28, 2026) ("Duke"). *See also*, *e.g.*, Sahir Mahraj, "AI Marketing: Personalization or Manipulation, *Medium* (May 1, 2023), https://medium.com/@sahirmaharaj/ai-marketing-personalization-or-manipulation-3e76c23409cf (last visited Sept. 23, 2026) ("As AI develops, it becomes more difficult to distinguish between personalized experiences that improve our experiences and deceptive strategies that prey on our weaknesses. … ***[T]he very algorithms that can predict our needs and desires can also be used to influence our emotions, behaviors, and decision-making processes.***") (emphasis added).

Professor Ali Makhdoumi of Duke University's Fuqua School of Business, "the new AI tools are also making companies better at understanding customers' vulnerabilities, which may enable them to manipulate user behavior in ways beneficial for the company but not for customers."[2]

3. DK has weaponized AI to do just that – understand and exploit users' vulnerabilities to financially benefit the company.

4. According to a bombshell *New York Times* report, which was just published on September 19, 2026, "in 2023, DraftKings took customer betting records and built a machine learning model, a form of artificial intelligence that seeks patterns in data, to answer the question: Who was more likely to respond to promotions by gambling – and losing – more?" (the "Model").[3]

5. "Machine learning is a subfield of artificial intelligence," according to the MIT Sloan School of Management, "that gives computers the ability to learn without being explicitly programmed."[4] According to that school, the terms "AI" and "machine learning" "are often used interchangeably and sometimes ambiguously."[5]

---

2 Duke*, supra*. *Cf. also*, *e.g.*, *Maharaj*, *supra* ("The same algorithms that can guide us to the ideal pair of sneakers can also be employed to take advantage of our weaknesses."). Professor Markhdoumi also explained: "If the platform can fool consumers for a long time, it will engage in behavioral manipulation[.]" Duke, *supra*. *See also id.* ("This means companies may use the information imbalance to guide consumers to products that would only advantage the company and may even be 'harmful' for the customers, he said, mentioning possibilities involving surveillance and price discrimination.").

3 Alex Klavens, Walt Bogdanich, & Jenny Vrentas, "How DraftKings Uses A.I. to Target the Gamblers Likeliest to Lose," *The New York Times* (Sept. 19, 2026), *available at* https://www.nytimes.com/2026/09/19/business/draftkings-ai.html?smid=nytcore-ios-share (last visited Sept. 28, 2026) ("NYT: DK Uses AI"). To prepare its report, "The Times interviewed more than 40 former DraftKings employees, and obtained internal research memos, presentations, and Slack messages as well as betting records from experiments conducted on customers." *Id.*

4 Sara Brown, "Machine learning, explained," *MIT Management Sloan School* (Apr. 21, 2021), https://mitsloan.mit.edu/ideas-made-to-matter/machine-learning-explained (last visited Sept. 28, 2026).

5 *Id.*

6. DK's intended use of AI, *i.e.*, the Model was to "predict[] how promotions would translate into a user's eventual wins or losses."[6] "The core question," according to one former DK employee, was "[i]s this person going to give us more than we're giving them? … And if the answer is yes, open the floodgates."[7]

7. "DraftKings makes money when gamblers lose money. And the [M]odel sought to identify those it could get to lose the most. It scored each customer based on their habits: The higher the score, the more money a gambler was likely to lose for each promotion offered."[8]

8. DK, "using data science," then used this score, upon information and belief, to in fact "target losing gamblers with promotions that encourage more betting."[9]

9. DK's conduct – which runs contrary to (a) Massachusetts law, *see* 205 CMR, § 257.02, and (b) its own explicit promise to use users' personal data to ensure that those users are playing responsibly – is both unfair and deceptive. Through its conduct, DK has, *inter alia*. breached its contractual obligation(s) and unjustly benefitted itself at the expense of Plaintiff and other users.[10]

---

[6] NYT: DK Uses AI, *supra*.

[7] *Id.* (internal quotations omitted).

[8] *Id.*

[9] *Id.*

[10] At this time, Plaintiff, individually and/or on behalf of any similarly situated individual(s), is not asserting any claim(s) against DK for violation(s) of the Massachusetts Consumer Protection Act, Mass. Gen. Law. Ch. 93A, §1, *et seq.* (the "MCPA"). The only claims currently being asserted are non-statutory ones, *i.e.*, claims for breach of contract, breach of implied contract, and money had and received. That said, contemporaneously with the filing of the Complaint, Plaintiff, on behalf of himself and all individuals similarly situated, is sending DK notice pursuant to Mass. Gen. Law. Ch. 93A, §9. Unless DK makes an acceptable tender of settlement in the meantime, Plaintiff, after 30 days, will move to amend the Complaint to add a claim for violation(s) of the MCPA and to seek additional damages consistent therewith.

**The Parties**

10. Plaintiff Mr. Vest is a resident and citizen of the State of West Virginia, who has gambled thousands of dollars with DK.

11. Defendant DK is a corporation formed under the laws of the State of Nevada on or about July 14, 2022. Its headquarters are located at, and its principal address in the United States is, 222 Berkeley Street, Fifth Floor, Boston, Massachusetts 02116. As such, it is a citizen of the State of Nevada and the Commonwealth of Massachusetts.

**Jurisdiction and Venue**

12. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business, and is authorized to do business, in this commonwealth, and/or as otherwise permitted by law. *See* Mass. Gen. Law. Ch. 223A, §2 ("A court may exercise personal jurisdiction over a person domiciled under the laws of or maintaining his or its principal place of business in, this commonwealth as to any cause of action.").

13. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332(d)(2) because this action is (i) a class action; (ii) in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one member of the class of plaintiffs is a citizen of a state (*e.g.*, West Virginia) different from Defendant, and/or as otherwise permitted by law.

14. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2)-(3) because, *inter alia*, a substantial part of the events or omissions giving rise to the claim(s) occurred in this district and/or Defendant is subject to personal jurisdiction in this District, and/or as otherwise permitted by law.

**Background**

15. DK is "a digital entertainment and gaming company."[11] According to its 2025 Form 10-K: "We provide users with online and retail sports betting (together, 'Sportsbook'), online casino ('iGaming'), daily fantasy sports ('DFS'), digital lottery courier, prediction markets and other product offerings."[12]

16. In addition to from other sources, DK "makes money by taking a percentage cut from playing tournaments, sports betting and gambling products …"[13] In other words, the more money users bet with DK, and the more money they lose, the more money DK makes.[14]

17. DK's "revenues are predominantly generated through two product offerings – Sportsbook and iGaming."[15]

18. And, DK certainly has a lot of revenue: "During the fiscal years ended December 31, 2025, 2024 and 2023, [DK] had revenue of $6,054.5 million, $4,767.7 million and $3,665.4 million, respectively; average monthly unique payers ('MUPs') of 4.0 million, 3.7 million and 2.7 million, respectively; average revenue per MUP ('ARPMUP') of $125, $106 and $113, respectively; Sportsbook Handle of $53.6 billion, $48.1 billion and $37.4 billion, respectively; and Sportsbook Net Revenue Margin of 7.1%, 6.0% and 5.6%, respectively."[16]

---

[11] DraftKings, Inc. Form 10-K (for the Fiscal Year Ended December 31, 2025), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001883685/44c31984-234d-4974-8cc7-8809680cf6ea.pdf ("2025 Form 10-K") (last visited Sept. 28, 2026), at 3.

[12] *Id.*

[13] Viktor Hendelman, "How Does DraftKings Make Money? Analyzing its Business Model," *Productmint*, https://productmint.com/draftkings-business-model-how-does-draftkings-make-money/ (last visited Sept. 28, 2026).

[14] *See*, *e.g.*, *supra* at ¶ 7.

[15] 2025 Form 10-K, *supra*, at 3.

[16] *Id.*

19. DK's revenue has continued to trend upwards in 2026: "DraftKings' first three months of 2026 have been better than many expected, as the company reported $1.65 billion in revenue, which is 17% higher than the first quarter of 2025."[17]

20. At the same time that it chases profits, DK also claims to be ethically driven:

- "We are also highly focused on our responsibility as a steward of this new era in real-money gaming. Our ethics guide our decision making, with respect to both the tradition and integrity of sports and our investments in regulatory compliance and consumer protection."[18]

- "Responsible Gaming is fundamental to DraftKings' mission. We make tools and resources available to all our customers to support responsible play. All employees receive annual responsible gaming training, and customer-facing employees receive additional training."[19]

21. DK promotes "it commitment to promote responsible gaming":[20]

*[Remainder of page intentionally left blank.]*

---

[17] Martin Green, "DraftKings' Q1 Report Reveals Rising Revenue," *Bookmakers Review* (May 10, 2026), https://www.bookmakersreview.com/industry/draftkings-q1-report-reveals-rising-revenue/ (last visited Sept. 28, 2026) (emphasis omitted).

[18] 2025 Form 10-K, *supra*, at 3.

[19] *Id.* at 11.

[20] *See* "Responsible Gaming," *DraftKings*, https://games.draftkings.com/responsible-gaming-about (last visited Sept. 28, 2026) (internal capitalization omitted).

PRODUCTS ABOUT INVESTORS NEWS COMMUNITY CAREERS SIGN UP

# Responsible Gaming

## OUR STANCE

At DraftKings, we believe it's more fun when it's for fun and we want it to stay that way. That's what responsible play is all about. It's important to remember that you should only bet what you can afford and always set reasonable limits for yourself.

Access our responsible gaming tools at the **DraftKings Responsible Gaming Center**.

We provide our customers with helpful tools so they can set budgets, limits, and cool-off periods, and encourage all customers to use these tools as a way to keep their play fun. We always give customers the option to self-exclude as well. If, for any reason, you feel like you need help beyond the tools we provide, we strongly encourage you to contact your local responsible gaming organization, which can be found through the **National Council on Problem Gambling**.

***



### OUR COMMITMENT TO PROMOTE RESPONSIBLE GAMING

DraftKings is committed to educating and empowering all of our customers by providing them with resources to help them develop healthy gaming habits. This information is available on our websites, mobile apps, retail sportsbooks, customer emails, and in our offices.

While the vast majority of our customers play for fun and entertainment, we're also committed to raising awareness of resources for those who may be facing problem gaming-related challenges.

***



### OUR COMMITMENT TO ADVERTISE RESPONSIBLY

DraftKings is committed to advertising our products in a safe and responsible way. In addition to complying with applicable state regulations, we adhere to the principles in the American Gaming Association's Responsible Marketing Code for Sports Wagering on advertising standards. Core components of the Code include respecting the legal age for sports wagering, supporting responsible gaming, limiting college and university spending, controlling digital media and websites, and maintaining the code and monitoring code compliance. DraftKings includes a responsible gaming message and/or toll-free helpline number on all of our advertisements. DraftKings always works to provide clear and conspicuous information about all promotions and offers.

DraftKings constantly strives to incorporate responsible gaming into its brand and marketing strategy, working to educate customers across a broad range of consumer touchpoints, including its digital social media channels and retail sportsbooks.

22. In fact, in its extant Privacy Notices, DK claims to use a user's "Personal Information" to, *inter alia*, ensure "Responsible Play":

> ***As part of our commitment to responsible play, we may use the information collected about you to assess whether you are responsibly playing in DFS contests and Gaming offerings. In the event we identify potentially problematic information, we may contact you to provide resources to help ensure that you are playing responsibly.*** By using our Website, Applications, or other Services, you consent to our use of your information for these purposes.[21]

23. Despite its professed "commitment to responsible play" and to "ensur[ing] that [users] are playing responsibly," DK, upon information and belief, uses AI, and has developed its Model, ***not to protect users but, rather, to target the most vulnerable among them***:

> [A former DK employee] initially thought DraftKings aimed to save money by avoiding people who were unlikely to be profitable. But he said his supervisors told him that the company did not want to reduce its promotional spending but rather to "redeploy" it. ***He understood this to mean the goal was to direct more promotions toward the biggest losers.***
>
> …
>
> Two other former analysts who worked on targeting projects told The Times that they independently raised concerns with their superiors that these models would identify vulnerable gamblers as promotional targets, and asked to put protections in place.
>
> Both received the same response: ***no.*** That would [supposedly] be handled by another part of the company, they said they were told. [22]

24. *The Times* reported:

> ***DraftKings has continued to hone its methods, using data science, to target losing gamblers with promotions that encourage more betting, according to six former employees who worked on them.*** At the same time, four other former employees said, ***DraftKings has stalled or squashed efforts to use similar technology to predict who might develop a gambling problem*** based on their betting activity.
>
> …

---

[21] *See*, *e.g.*, Privacy Notice," *DraftKings Sportsbook* (Last Updated: May 21, 2025), https://sportsbook.draftkings.com/legal/privacy-notice (last visited Sept. 28, 2026) ("Sportsbook Privacy Notice") (emphasis added).

[22] NYT: DK Uses AI, *supra* (emphasis added).

> This betting data may also contain signs that a person is headed for trouble. Yet ***when employees developed a machine learning model that would have assigned users "risk scores," the company sidelined it***, according to two former employees who worked on that project.[23]

25. To accomplish its goal of identifying "likely losers,"[24] DK, according to *The Times*, "analyzed dozens of data points for each gambler, including how frequently they played, their daily account balances and how much they typically lost compared with how much they bet. It also incorporated another model that calculated how likely a user was to stop gambling."[25]

26. Upon information and belief, DK, which has intentionally, willfully, and/or knowingly engaged in unfair and/or deceptive acts and/or practices, did not disclose to its users that it was using the Model, AI, machine learning, or their personal information in this manner.

27. According to *The Times:* "The online casino is where, in mid-2023, DraftKings set out to build a model for predicting how promotions would translate into a user's eventual wins or losses."[26] At about the same time, "DraftKings began building similar models for sports betting promotions, according to eight former employees."[27]

28. That newspaper also reported:

> DraftKings already had a system that weighed factors like a gambler's skill, how much they bet and tax rates on gambling revenue in the state where they lived.
>
> But it was relatively crude. According to one internal memo, it offered "no information or insight on expected user-level profitability of reinvestment

---

23 *Id.* (emphasis added).

24 *Id.*

25 *Id.*

26 *Id.*

27 *Id.*

> dollars" – in other words, DraftKings did not know how effective its promotions were at inducing gamblers to lose.
>
> Figuring this out required machine learning. Unlike traditional data analytics, where researchers decide which patterns to look for, machine learning models can sift through hundreds of variables on their own to find combinations that help predict particular behaviors.[28]

29. Also, according to *The Times*: "Data scientists … trained the new casino model on historical data"[29] and tested it on then-current DK customers. "Users with below-average scores were deemed 'inelastic' and marked for fewer incentives."[30] So-called "elastic"[31] users, upon information and belief, were treated differently.

30. Upon information and belief, those "elastic" users were, unbeknownst to them, sent extra e-mail, texts, online or in-app notifications, and/or messages, and/or also offered extra promotions and/or incentives, which were intended to keep them gambling with (and to prevent them from leaving) DK.

31. *The Times* explained: "One former employee said he had worked on a system that looked for people at risk of leaving the platform and tried to coax them back. Another said he helped develop a program that ramped up promotions for people gambling more aggressively than usual."[32]

32. A former DK employee told *The Times*: "***It is a predatory as it sounds***."[33]

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.* (emphasis added).

33. AI, such as the Model, creates what one commentator calls "systematic cognitive biases on an unprecedented scale."[34] For example, according to that commentator, AI can be responsible for "[a]spirational [n]arrowing, "[e]motional [e]ngineering," "[c]ognitive [e]cho [c]hambers," and "[m]ediated [s]ensation."[35]

34. Of particular note here is aspirational narrowing: "AI-driven personalization, while seemingly beneficial, can create what cognitive psychologists call 'preference crystallization,' where our desires become increasingly narrow and predictable. Hyper-personalized content streams subtly guide our aspirations toward commercially viable or ***algorithmically convenient outcomes***, potentially limiting our capacity for authentic self-discovery and goal-setting."[36]

35. Another commentator observed:

> AI systems can influence emotions in various ways. In advertising, AI-powered platforms analyze consumer data to create highly personalized and emotionally resonant advertisements. By leveraging data such as past purchasing behavior, online activity, and even biometric signals, AI systems can craft messages designed to trigger specific emotional responses, whether it's happiness, fear, or nostalgia. This personalized approach to advertising has been shown to increase engagement and sales but also raises concerns about consumer autonomy. ***The use of emotional manipulation in advertisements has the potential to exploit vulnerable individuals***, such as those struggling with mental health issues or financial difficulties, by triggering emotions that drive impulsive decisions.[37]

---

34 Cornelia C. Walther, "The Psychology of AI's Impact on Human Cognition," *Psychology Today* (June 3, 2025), https://www.psychologytoday.com/us/blog/harnessing-hybrid-intelligence/202506/the-psychology-of-ais-impact-on-human-cognition (last visited Sept. 23, 2026).

35 *Id.*

36 *Id.* (emphasis added).

37 Aziz Othman, "AI and Emotional Manipulation: Ethical Concerns and Implications in Advertising, Product Design, and Political Campaigns" (May 2025), *available at* https://www.researchgate.net/publication/391629371_AI_and_Emotional_Manipulation_Ethical_Concerns_and_Implications_in_Advertising_Product_Design_and_Political_Campaigns (last visited Sept. 28, 2026) (internal citation omitted) (emphasis added).

36. Indeed, one former DK employee – a "data scientist who worked on promotions" – said the promotions offered to "elastic" users by DK "were effective because they take advantage of gamblers' psychology."[38]

37. As DK knows (and/or should have known), gambling, including but not limited to, online gambling, is and/or can be addictive.[39] The National Institute on Drug Abuse explains:

> Mobile technologies have transformed gambling over the past two decades in a manner analogous to how synthetic drugs have transformed the drug landscape over the same period of time. Just as new, cheap, high-potency synthetic opioids like fentanyl have created conditions for faster progression from initiation to disordered opioid use, gambling on high-speed, 24/7 mobile platforms exposes vulnerable people to a potent combination of continuous betting opportunities, data-driven promotions, and real-time micro-rewards. New markets are exposed to gambling, and compulsive use of these platforms is a predictable result.
>
> The legalization of online gambling is associated with larger increases in irresponsible or risky gambling, particularly among those with lower incomes who can least absorb losses. Adolescents, who may be exposed to online gambling influencers and "risk-free" promotions in sports media and social media feeds, are likely to be especially susceptible due to their heightened reward sensitivity and immature executive control and impulsivity.[40]

---

[38] NYT: DK Uses AI, *supra.* Upon information and belief, gamblers are particularly susceptible to manipulation by AI.

[39] For instance, on its website, DK provides resources for someone who "has a gambling problem," including, for example, (a) links to information about "Risks associated with gambling" and "Signs and symptoms of a gambling problem and how to get help," as well as (b) links to the PCGB Office of Compulsive and Problem Gambling, The National Council on Problem Gambling, the Department of Drug and Alcohol Programs gambling addiction participating provider list, and Gamblers Anonymous. "Think you or someone you know may have a problem? Reach out for help.," *DraftKings Account*, https://rg.draftkings.com/sa/resources/problem-gambling-help?intendedSiteExp=US-PA-SB&_gl=1*v19dic*_gcl_dc*R0NMLjE3OTAxMDI1NjkuMjE2NDhhOGUxYWUyMTIyMGIxMGVlMDNjZDExOWU4ODE.*_gcl_au*MTIyMjAyNjY3MS4xNzkwMTAyNTY3*_ga*ODE3OTYyNTk2LjE3OTAxMDI1Njc.*_ga_QG8WHJSQMJ*czE3OTAyNTc0NDkkbzUkZzEkdDE3OTAyNTc0NTEkajU4JGwwJGgw (last visited Sept. 28, 2026). *See also*, *e.g.*, *supra* at ¶ 21.

[40] Nora Volkow, "Gambling disorder in the age of mobile sports bettering," *National Institute on Drug Abuse* (Nov. 14, 2025), https://nida.nih.gov/about-nida/noras-blog/2025/11/gambling-disorder-in-the-age-of-mobile-sports-betting (last visited Sept. 28, 2026). *See also*, *e.g.*, NYT: DK Uses AI, *supra* ("Health experts have long recognized gambling as addictive, but many critics see this modern version, where people can bet from their couch on the outcome of a single baseball pitch, as especially

38. As a result of, *inter alia*, its deceit and psychological manipulation, DK's AI-based efforts, which are predicated on its Model, have, upon information and belief, been successful. For example:

- "A DraftKings executive recently told investors that data science and analytics helped it improve its margins on promotion-driven sports bets by 13 percent in 2025 and that it used A.I. to personalize hundreds of millions of promotional dollars."[41]

- "Promotions, which take on forms like a free bet, a 'profit boost' or a deposit bonus, play a vital role in DraftKings's [sic] business: The company brought in around $8.7 billion in gross revenue from sports and casino gamblers last year, and gave out about $3 billion in promotions, according to research by Citizens Bank."[42]

39. Also, as a result of its Model, as well as DK's deceit and manipulation:

- "Several gamblers told The Times that promotions fueled their addictions."[43]

- "Hassel Velasco, a former member of DraftKings's customer service team, told The Times that on about a dozen occasions he heard

---

dangerous. A study published last year in JAMA Internal Medicine cited a rise in Google searches like 'Am I a gambling addict?' Calls about sports betting to Ohio's problem gambling help line have more than quadrupled since the state legalized it in 2023."). *Cf. also*, *e.g.*, Kellie Schmitt, "As Online Betting Surges, So Does Risk of Addiction," *Hopkins Bloomberg Public Health* (Dec. 19, 2025), *available at* https://magazine.publichealth.jhu.edu/2025/online-betting-surges-so-does-risk-addiction (last visited Sept. 23, 2026) ("'There is a risk that online sports betting could lead to a gambling disorder, which can lead to bad mental health, drug use, and personal outcomes,' says Matthew Eisenberg, PhD, an associate professor in Health Policy and Management. … Gambling disorder falls in the same diagnostic category as drug and alcohol use disorders. One in five people with a gambling disorder attempt or complete suicide, an even higher risk than with other substance use disorders. Gambling tends to occur alongside other behavioral health conditions, such as problem alcohol, tobacco, and drug use, adds Christopher Welsh, MD, medical director of the Maryland Center of Excellence on Problem Gambling. Plus, mobile sports betting skews heavily toward younger male users, a population already facing higher rates of suicide and loneliness.").

41 NYT: DK Uses AI, *supra.*

42 *Id.*

43 *Id.*

> complaints from problem gamblers who continued to receive promotions."[44]

40. Mr. Vest, who has used DK's Sportsbook and iGaming products, has gambled thousands of dollars with DK annually for a number of years. He also has been inundated with e-mail, texts, online or in-app notifications, messages, incentives, and/or promotions. For example, in the approximately 30 days leading up to September 25, 2026, Mr. Vest received at least approximately 70 e-mail, texts, online or in-app notifications, and/or messages from DK.

41. As just one example, on September 23, 2026, Mr. Vest received the following e-mail from DK:[45]

*[Remainder of page intentionally left blank.]*

---

[44] *Id.*

[45] Mr. Vest's e-mail address has been redacted from images throughout the Complaint. His counsel will provide it to DK at the appropriate time during discovery subject to an appropriate confidentiality or protective order.

From: **DraftKings Casino** <draftkings@d.email.draftkings.com>
Date: Wed, Sep 23, 2026, 11:34 AM
Subject: Exclusive Slots Offer: Play Lil Tut King's Temple!
To: <danielves[redacted]>







**How it Works:**

- **Step 1** - Opt Into the offer by clicking the “Opt In” button
- **Step 2** - Wager $50 on Lil' Tut Kings Temple, prior to 09/23/2026 at 11:59 PM ET
- **Step 3** - Your 25 Flex Spins will be credited instantly!

CLAIM INSIDE

Gambling Problem? Call 1-800-GAMBLER
21+. Physically present in WV. Eligibility restrictions apply. See terms at draftkings.com/casino. In partnership with Hollywood Casino at Charles Town Races (WV). All games regulated by the West Virginia Lottery. Please play responsibly.






# ADDITIONAL INFO

*Thank you for choosing to participate in this promotion (the "Promotion") being offered by DraftKings. By entering or participating in the Promotion you hereby agree to be bound by these Promotion terms (the "Promotion Terms," together with the DraftKings Terms of Use and General Rules, the "Terms"). If you do not wish to be bound by the Promotion Terms, please do not enter or participate in the Promotion. If you have any questions regarding the Promotion or the Terms, or wish to cancel your participation in this Promotion, please contact support@draftkings.com for more information.

**(1) DESCRIPTION**

Customers who play $50+ on Eligible Games will earn 25 Flex Spins.

**(2) DATE AND TIME OF PROMOTION**

Promotion valid between 09/23/2026 at 12:00 AM Eastern Time (ET) and 09/23/2026 at 11:59 PM ET (the "Promotional Period").

**(3) ELIGIBILITY**

To be eligible for DraftKings Casino and the Promotion, you must be physically located in: CT, MI, NJ, PA, or WV (each an "Eligible Jurisdiction" or, collectively, the "Eligible Jurisdictions") and you must be 21+ years of age or older. Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gambling, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

Customers must be invited to receive this Promotion. Promotion is only valid for the intended recipient - customers who receive this offer via an email forward, screenshot, or other means shall not be eligible.

**(4) REQUIRED ACTIONS**

In addition to the eligibility requirements set forth above and in the Terms, to participate in the Promotion, customers must (1) be a registered DraftKings Casino customer with an active account; (2) receive an offer to participate in this Promotion; (3) if required, opt-in by clicking the appropriate link/button within the Promotional Period; and (4) place Qualifying Wagers on Eligible Games.

Upon completion of the promotion requirements, qualified customers will be eligible to earn Bonus

Rewards according to the following play requirements (the "Qualifying Wagers"):

Wager $50 or more on Lil' Tut Kings Temple to earn 25 Flex Spins (the "Bonus Rewards"). Qualifying Wager(s) must be placed within the Promotional Period.

**(5) BONUS REWARD REDEMPTION AND LIMITATIONS**

Flex Spins (the "Spins") are game credits rewarded by DraftKings promotions or through gameplay on slots games. Spins are single-use, non-transferable, non-withdrawable, and are only eligible for use on Select Games. Spins valid only on Select Games and may vary in value depending on the Select Games for which they were issued, or due to the promotion from which they were earned. Customers may choose which Select Game they would like to play to use their Spins.

Select Games list can be found by navigating to the Rewards page via the DraftKings Casino app or website. Customers must click on "Rewards" to view their Rewards page. On that page, Customers must click on the "Rewards" tab and select the "Casino" toggle to view their rewards. Customers will see a card to activate their Flex Spins and must click the "Play Your Spins" button to activate their Spins and choose a Select Game from the list provided. Select Games are determined in DraftKings sole discretion and subject to change.

Customers must choose the Select Game to use their Spins on within 2 days (48 hours) of receiving the Spins. Upon choosing a Select Game, the remaining Spins balance is locked to that Select Game, meaning the customer may not use that allotment of Spins on any other Select Game. If applicable, upon collecting another allotment of Spins, customers may choose the same or a different Select Game. For example: A customer earns 500 Spins issued over 10 days at 50 Spins per day. The customer collects 50 spins on Sept. 1 and chooses to play Cash Eruption Vegas. The customer uses 1 rewarded Spin on Cash Eruption Vegas. The remaining 49 Spins must be used on Cash Eruption Vegas before they expire. On Sept. 2, the customer will collect another allotment of 50 Spins from the promotion and can choose a different Select Game.

In jurisdictions where Select Games may not be available, DraftKings will provide Spins for another featured game of equal or greater value, or will offer an equivalent value in the number of Spins given. Spins are locked to the jurisdiction in which they have been issued and may only be used in that jurisdiction. Spins are controlled by the game's developer and may be referred to as ("Free Spins," "Free Rounds," "Bonus Spins," etc.). DraftKings does not control the functionality of Spins. DraftKings may reward Spins at specific values, a specific number of Spins, or a specific value and number of Spins. In all cases, a single Spin will be worth at least the minimum wager on the Select Game for which it was issued.

If a customer has received Spins from other DraftKings promotions, the Spins that expire first will be used first. In-game Spin bonuses provided by the game developer are automatically used when earned until played through. Spins cannot be combined with cash or bonus rewards wagers. SPINS FROM THIS PROMOTION EXPIRE 7 DAYS (168 HOURS) AFTER CHOOSING A SELECT GAME. Failure to use Spins before expiration will void the reward. Spins payouts from Spin wagers will be transferred to the customer's cash balance at which time they may be withdrawn. Spins wagers do not contribute to Crown accruals, leaderboards, in-game jackpots, or DraftKings Casino jackpots. Upon notice to customers, DraftKings may change the game availability of Spins at any time and at DraftKings's sole discretion.

Bonus Rewards will be credited immediately to customers' accounts, or in the event of technical difficulties, within 72 business hours of successfully completing the promotion requirements. Customers can track their Promotion progress via the Casino site and app.

**(6) REGISTRATION**

See DraftKings Terms of Use for information on eligibility for creating, using, and funding an interactive gaming account.

**(7) LIMITS ON PARTICIPATION**

Limit one (1) offer per customer. Reward substitutions or changes will be made in DraftKings's sole discretion. See the Terms for information and limitations on wagering.

**(8) WAGERING RESTRICTIONS AND LIMITATIONS**

Qualifying Wagers must be placed with cash from your cash balance or DK Dollars. Wagers placed with bonus rewards (e.g., Casino Credits or Casino Bonus Funds) will not count toward this Promotion. Only the cash portion of wagers placed using a combination of Bonus Rewards and cash will count toward this Promotion. Any portion of your cash balance you deposited to contribute to a deposit match promotion awarding casino bonus funds will not contribute to this Promotion.

Play prior to opt in will not be counted towards the Promotion and cannot be retroactively added.

Wagers only contribute to one promotion at a time, determined by your Priority Promos ranking within the Reward Center. The top-ranked promotion defaults to the first promotion you opt into, though you may adjust your ranking in the Reward Center at any time. Your Priority Promos ranking only applies when a Qualifying Wager could count toward multiple promotions. Qualifying Wagers will only apply to your highest ranked eligible Promotion.

*Example:* If you opt into Promo 1 on September 1 and Promo 2 on September 3, your default ranking will be Promo 1 above Promo 2. A wager qualifying for both will count only toward Promo 1.

DraftKings is not liable for computer, program, software, or other internet malfunctions, nor for any errors or delays that affect your Priority Promo ranking. In the event that you change your ranking and it has not been properly reflected in your Reward Center, wagers will contribute to promotions based on the ranking recorded at the time you placed the wager.

**(9) ORDER OF FUNDS USED FOR WAGERING**

Funds are wagered in the following order: (1) DK Dollars, then (2) Cash in your cash balance.

**(10) ELIGIBLE GAMES**

Promotion Eligible Games: Lil' Tut Kings Temple

Wagers made on Electric Poker do not contribute to this Promotion. The Bonus Reward is limited to Select Games only.

**(11) RESTRICTIONS ON WITHDRAWAL OF FUNDS**

You may withdraw funds deposited in connection with this Promotion subject to the Terms. Any wager placed on DraftKings Casino in connection with the Promotion cannot be rescinded once it has been placed. Subject to any play-through restrictions in connection with a promotion, funds earned from winnings may be withdrawn at any time.

**(12) RULES REGARDING CANCELLATION**

Should you wish to cancel your participation in this promotion at any time, please contact customer experience at support@draftkings.com. Upon cancellation, You may withdraw funds deposited in connection with this Promotion subject to the Terms. Any wager placed on DraftKings Casino in connection with the promotion cannot be rescinded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn.

**(13) RESPONSIBLE GAMING**

If you or someone you know has a gambling problem, help is available, Call 1-800-GAMBLER, 1-800-MY-RESET. Please play responsibly.

**(14) OTHER INFORMATION**

Whether a customer has committed abuse of this Promotion, or violated the Terms, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the Terms. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings account holders are responsible for any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors in bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Terms, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or any other offers or promotions, including this Promotion, in any way.

If physically located in PA, this Promotion will comply with subsection §813.3 regarding cancellation in this Promotion by a customer.

DraftKings reserves the right to suspend, modify, and/or cancel this Promotion for any reason in its sole discretion.

DFS | Sportsbook | Casino | Pick6 | Racing | Predictions | Lottery

DraftKings Inc. is a US-based company.
© DraftKings All Rights Reserved

This email was sent to: danielves
This email was sent by: DraftKings Inc.

DraftKings Privacy Policy | Predictions Privacy Policy

**DraftKings is committed to Responsible Gaming**

DraftKings Code of Responsible Play | DraftKings RG Tools & Resources

If you wish to no longer receive promotional e-mails, please Unsubscribe or send a postcard with your name, e-mail and DraftKings username to the address above with Attn: Customer Experience.
To manage your DraftKings email preferences or unsubscribe, click here.

42. Further, just as a limited set of additional examples, Mr. Vest received, among others, additional e-mail from DK in September 2026, each offering a promotion or incentive, including:




***




***


IT'S MORE FUN
MY BUDGET & CONTROLS
WHEN IT'S FOR FUN
TICKETS, TRAVEL, GOLF, AND MORE!
THE PLAYERS CHAMPIONSHIP GIVEAWAY
Opt in & visit My Stat Sheet to stay on top of your game and take a shot at a VIP golf experience!
VIEW MY STAT SHEET
My Stat Sheet
Money Stats
My Budget and Controls
Withdrawals
$350
DRAFT KINGS
PGA TOUR

***


DRAFT KINGS
THE CROWN IS YOURS
REWARDS TIER: BRONZE | TIER CREDITS: 1,130
Play Huff N' Even More Puff Grand
Wager $50+ on Huff N' Even More Puff Grand to earn 25 Flex Spins! Choose Your Slots*
VIEW PROMO

***




***




43. During that same month, *i.e.*, September 2026, Mr. Vest received numerous other e-mail, texts, online and/or in-app notifications, and/or messages from DK, many of which offered him a promotion or incentive.

44. Prior to September 2026, Mr. Vest similarly received many other e-mail, texts, online or in-app notifications, messages, incentives, and/or promotions from DK, including, but not limited to ones sent if he went just a few days without gambling. For example, in addition to other promotions and incentives, DK has offered Mr. Best:




***




***




***


DRAFTKINGS
PICK6
NFL
Official Daily Fantasy Partner of the NFL
30%
WINNINGS BOOST
on your next NFL entry. see details below*
OPT IN

***


DRAFTKINGS
PICK6
NFL
Official Daily Fantasy Partner of the NFL
YOUR NEXT NFL PICK'S ON US
If the Miami Dolphins QB passes for 1 yard, that pick HITS!
PICK NOW
3+ Pick Entries Only | $10 Max. Entry fee*
GIMME PICK
MIAMI
QB
0.5
Passing Yards

***


DRAFT KINGS
PICK6
BASEBALL
30%
WINNINGS BOOST
for your baseball entry! See details below*
CLAIM NOW

***


WNBA
DRAFTKINGS
PICK6
An Official Daily Fantasy Sports Partner of the WNBA
WNBA PLAYOFFS
Google
30%
WINNINGS BOOST
on your WNBA entry! See details below.*
CLAIM NOW

***




***




45. Mr. Vest, like other DK users, continues to receive e-mail, texts, online or in-app notifications, messages, incentives, and/or promotions from DK, and DK "continues to develop techniques for targeting sports and casino bettors as recently as this year."[46]

**Class Allegations**

46. Plaintiff brings this class action on behalf of himself and all other individuals who are similarly situated, pursuant to Federal Rule of Civil Procedure 23.

47. Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals who, within the relevant statute of limitations, were deemed by DraftKings to be "elastic" and/or received targeted e-mail, texts, online or in-app notifications, messages, incentives, and/or promotions from DraftKings based on DraftKings' use of the Model (the "Class").

48. Specifically excluded from the Class are (a) Defendant; (b) any of its parents, subsidiaries, affiliates, divisions, predecessors, successors, or any other entities it legally controls; (c) each of their officers, directors, members, agents, trustees, employees, principals, servants,

---

46 *Id.*

partners, or representatives, as well as each of their parents, spouses, children, trusts, heirs, successors, and assigns; and (d) the judicial officer to which this case is assigned and his or her parents, spouses, children, trusts, heirs, successors, and assigns.

49. Subject to additional information obtained through further investigation and discovery, Plaintiff reserves the right to amend, narrow, or expand the class definition(s).

50. *Numerosity:* The Class is so numerous that joinder of all members is impracticable. "DraftKings says it has 11 million customers …."[47] While, admittedly, not all DK customers are likely to be members of the Class and the precise number of Class members is unknown to Plaintiff at this time, the Class is likely to include thousands, tens of thousands, hundreds of thousands, or even millions of individuals. Numerous other persons have suffered similar injuries. The names and addresses of affected individuals are known to Defendant and can be identified through Defendant's records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

51. *Commonality:* There are questions of law and fact common to the members of the Class including, without limitation:

- Did DK breach its obligation to use users' personal information to ensure responsible gaming when it instead used Plaintiff's, the Class members', and/or other users' personal information to develop (and train) the Model, to target vulnerable users, and to encourage irresponsible gaming?

- Would it be unjust and inequitable for DK to retain the monies it charged and collected from Plaintiff and the Class members as a result of targeting vulnerable users, who were identified by the Model, with extra e-mail, text, online or in-app notifications, messages, incentives, and/or promotions?

[47] *Id.*

In addition, common questions include ones concerning the amount of damages and other relief to be awarded to Plaintiff and the Class members.

52. *Typicality:* Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the other Class members each were subject to extra and/or targeted e-mail, texts, online or in-app notifications, messages, promotions, and/or incentives from DK based on information derived from the Model.

53. *Adequacy of Representation:* Plaintiff is an adequate class representative because (i) Plaintiff's interests do not conflict with the interests of the other Class members whom Plaintiff seeks to represent; (ii) Plaintiff has retained competent counsel who are experienced in complex class-action litigation; and (iii) Plaintiff intends to prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

54. *Predominance:* Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability is common to Plaintiff and each member of the Class.

55. *Superiority:* A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Class members are relatively small, making it impracticable for any Class member to bear the burden and expense required to individually prosecute claims against Defendant. Even if Class members could afford individual litigation, the court system could not. Individual litigation creates a potential for inconsistent or contradictory judgments and increases the delay

and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

56. *Ascertainability:* Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class members may be readily identified through Defendant's books and records.

**COUNT I**
**BREACH OF CONTRACT**
**(On behalf of Plaintiff and Class Members)**

57. Paragraphs 1-56 above are incorporated herein by reference as though fully set forth herein.

58. DK publishes online at least two Privacy Notices – one for its "Sportsbook" and one for its "Casino." For all relevant purposes, the two notices are identical.

59. Each notice states, in relevant part:

> DraftKings ("**DK**," "**we**," "**us**," or "**our**") strives to offer fans the most entertaining games and experiences found anywhere on the Internet. To ensure the trustworthiness of our games and the quality of your experience, we collect and process information about our consumers. We are committed to handling your information with respect because your privacy is important to us. We provide this notice to explain how we collect and use information from consumers of our website at https://www.draftkings.com("**Website**") [sic], our mobile applications ("**Applications**"), our Daily Fantasy Sports and Pick6 (collectively, "**DFS**") contests, our Sportsbook and Casino (collectively "**Gaming**") offerings, and related services including, but not limited to, our social networking features (collectively, "**Services**"). This notice does not apply to websites, applications, or services that do not display or link to this notice or that display or link to different privacy statements.[48]

[48] *See* Sportsbook Privacy Notice, *supra* (emphasis in original); Privacy Notice, *DraftKings Account* (Last Updated: May 21, 2025), https://myaccount.draftkings.com/documents/privacy-notice?intendedSiteExp=US-PA-CS (last visited Sept. 28, 2026) ("Casino Privacy Notice") (emphasis in original).

60. Thereafter, in both notices, DraftKings explains the "additional uses of personal information," which explicitly include "Responsible Play":[49]

> As part of our commitment to responsible play, we may use the information collected about you to assess whether you are responsibly playing in DFS contests and Gaming offerings. In the event we identify potentially problematic information, we may contact you to provide resources to help ensure that you are playing responsibly. By using our Website, Applications, or other Services, you consent to our use of your information for these purposes.[50]

61. Plaintiff and the Class members accepted DK's offer to safeguard their personal information and to use it to, *inter alia*, ensure responsible gaming by proceeding to use the DK website(s), application(s), etc. and by providing DK their personal information.

62. In consideration for, *inter alia*, DK's promise to use their personal information to ensure responsible gaming, Plaintiff and the Class members also agreed to pay, and did pay, DK.

63. There was an agreement(s) between DK, on the one hand, and Plaintiff and the Class members, on the other, concerning the treatment of users' personal information. DK, however, breached this agreement(s). Instead of using Plaintiff's and Class members' personal information to ensure that they were gaming ***responsibly***, DK used that information for the exact opposite purpose – to exploit and target Plaintiff and the Class members.

64. The Model consumed personal information provided by Plaintiff, the Class members, and/or other users to identify those users who were most likely to lose money via DK and/or who might otherwise leave DK. Those users, including Plaintiff and the Class members, were offered extra promotions and/or incentives, and sent extra e-mail, texts, online or in-app notifications, and/or messages to encourage them to gamble more and to play ***irresponsibly***. In

---

[49] *See* Sportsbook Privacy Notice, *supra* (internal capitalization omitted); Casino Privacy Notice, *supra* (internal capitalization omitted).

[50] Sportsbook Privacy Notice, *supra*; Casino Privacy Notice, *supra*.

other words, DK intentionally, willfully, and/or knowingly failed to fulfill its obligations under the agreement(s).

65. Plaintiff and the Class members paid all amounts due and owing to DK and adequately performed all obligations and duties required by the agreement(s).

66. DK's breaches caused Plaintiff and the Class members substantial damages and/or losses, which include, but are not necessarily limited to, those additional amounts that they gambled and/or lost after receiving the extra e-mail, texts, online or in-app notifications, messages, promotions, and/or incentives from DK, which were sent as a result of DK's use of the Model.

67. Relevant breaches, violations, injuries, harms, losses, and damages are continuing, on-going, and/or increasing.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

68. Paragraphs 1-67 above are incorporated by reference as though fully set forth herein.

69. If no express contract(s) between DK and its users concerning the use of personal information is found to exist, users, including Plaintiff and the Class members, instead entered into an implied contract(s) with DK about the use of their personal information.

70. In addition to other uses of its users' personal information, DK promises to use that information to ensure "Responsible Play":[51]

> As part of our commitment to responsible play, we may use the information collected about you to assess whether you are responsibly playing in DFS contests and Gaming offerings. In the event we identify potentially problematic information, we may contact you to provide resources to help ensure that you are playing responsibly. By using our Website,

[51] *See* Sportsbook Privacy Notice, *supra* (internal capitalization omitted); Casino Privacy Notice, *supra* (internal capitalization omitted).

> Applications, or other Services, you consent to our use of your information for these purposes.[52]

71. When Plaintiff and the Class members accepted DK's offer to safeguard their personal information and to use it to, *inter alia*, ensure responsible gaming; agreed to use the DK website(s), application(s), etc.; provided DK their personal information; and agreed to pay and did pay DK, DK agreed in return to abide by its promise to use their personal information to ensure "[r]esponsible gaming," thereby creating an implied contract(s). The parties' relationship and conduct demonstrate mutual assent to this agreement(s).

72. Plaintiff and the Class members fully performed their obligations under this implied contract(s) with DK by, *inter alia*, using its website(s), application(s), etc.; agreeing to pay, and paying, DK any and all amounts owed; and providing DK their personal information.

73. DK, however, breached this implied contract(s). Instead of using Plaintiff's and Class members' personal information to ensure that they were gaming ***responsibly***, DK used that information for the exact opposite purpose – to exploit and target Plaintiff and the Class members.

74. The Model consumed personal information provided by Plaintiff, the Class members, and/or other users to identify those users who were most likely to lose money via DK and/or who might otherwise leave DK. Those users, including Plaintiff and the Class members, were offered extra promotions and/or incentives, and sent extra e-mail, texts, online or in-app notifications, and/or messages to encourage them to gamble more and to play ***irresponsibly***. In other words, DK intentionally, willfully, and/or knowingly failed to fulfill its obligations under the implied contract(s).

---

[52] Sportsbook Privacy Notice, *supra*; Casino Privacy Notice, *supra*.

75. DK's breaches caused Plaintiff and the Class members substantial damages and/or losses, which include, but are not necessarily limited to, those additional amounts that they gambled and/or lost after receiving the extra e-mail, texts, online or in-app notifications, messages, promotions, and/or incentives from DK, which were sent as a result of DK's use of the Model.

76. Relevant breaches, violations, injuries, harms, losses, and damages are continuing, on-going, and/or increasing.

**COUNT III**
**MONEY HAD AND RECEIVED**
**(On behalf of Plaintiff and Class Members)**

77. Paragraphs 1-76 above are incorporated herein by reference as thought fully set forth herein.

78. The money paid by Plaintiff and the Class members to DK after they were identified and targeted by the Model should, in equity and good conscience, be returned to Plaintiff and the Class members.

79. DK was, and continues to be, unjustly enriched at the expense of Plaintiff and the Class members.

80. Plaintiff and the Class members conferred a benefit(s) on DK by, *inter alia*, paying it money and by providing it certain personal information.

81. DK knowingly accepted, received, and appreciated the benefit(s) conferred upon it by Plaintiff and the Class members.

82. DK has retained the full benefit(s) of the amounts paid by Plaintiff and the Class members after they were identified and targeted by the Model.

83. It would be unjust and inequitable for DK to retain that benefit(s) and those amounts under the circumstances, which include, but are not limited to, the following:

- DK's predatory misuse of data science for corporate profit;
- DK's nefarious use of AI to target and exploit vulnerable individuals;
- DK's creation and use of the Model specifically;
- DK's intent and efforts, through the Model, to identify users who were most likely to gamble and lose more money;
- DK targeting gamblers identified by the Model with e-mail, texts, online or in-app notifications, messages, promotions, and/or incentives intended to encourage more betting with DK;
- DK using the Model and/or other AI to psychologically manipulate users;
- DK's breach of its Sportsbook Privacy Notice, Casino Privacy Notice, and/or an implied contract(s);
- DK's misuse of users' personal information to encourage irresponsible play; and
- DK's failure to alert users that it is and/or was using the Model, AI, machine learning, and/or their personal information in a deceitful and unfair manner.

84. In addition, DraftKings' acts and omissions also violate Massachusetts Regulations, which state, *inter alia*:

- "A Sports Wagering Operator shall ***only use*** and retain Confidential Information and Personally Identifiable Information for ***legitimate business purposes necessary*** to operate or advertise a Sports Wagering Area, Sports Wagering Facility or Sports Wagering Platform, or to comply with M.G.L. c. 23N, 205 CMR, or any other applicable law, regulation, court order, subpoena or civil investigative demand of a governmental entity, to detect security incidents, protect against malicious, deceptive, fraudulent, or illegal activity; or prosecute those responsible for that activity, debug to identify and repair errors, to investigate, respond to and defend against filed or reasonably anticipated legal claims, and for other reasonable safety and security purposes."[53]

[53] 205 CMR, § 257.02(1) (emphasis added). *See also*, *e.g.,* 205 CMR, § 257.02(4) ("A Sports Wagering Operator shall collect patrons' Confidential Information and Personally Identifiable Information to

- "A Sports Wagering Operator ***may not use*** a patron's Personally Identifiable Information or Confidential Information, or any information derived from it, to promote or encourage specific wagers or promotional offers based on: … ***[a]ny computerized algorithm, automated decision-making, machine learning, artificial intelligence, or similar system that is known or reasonably expected by the Sports Wagering Operator or a vendor to the Sports Wagering Operator to make the gaming platform more addictive***."[54]

85. DK did not use Plaintiff's and the Class members' personal information for necessary, legitimate business purposes. Instead, it used that information to, *inter alia*, develop and train a computerized algorithm, machine learning, AI, and/or a similar system that was intended to exploit users and to keep them coming back to DK's platform and gambling more money.

---

analyze patron behavior for the purposes of identifying and developing programs and interventions to promote responsible gaming and support problem gamblers, and to monitor and deter Sports Wagering in violation of M.G.L. c. 23N and 205 CMR.").

The regulations also define "the following words and phrases [to] have the following meanings, unless the context clearly indicates otherwise," 205 CMR, § 257.01:

> <u>Confidential Information</u> means information related to a Sports Wagering Account, the placing of any Wager or any other sensitive information related to the operation of Sports Wagering including the amount credited to, debited from, withdrawn from, or present in any particular Sports Wagering Account; the amount of money Wagered by a particular patron on any event or series of events; the unique patron ID or username and authentication credentials that identify the patron; the identities of particular Sporting Events on which the patron is Wagering or has Wagered, or the location from which the patron is Wagering, has Wagered, or has accessed their Sports Wagering Account. Confidential Information may also include Personally Identifiable Information.
>
> <u>Personally Identifiable Information</u> means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular patron, individual or household. Personally Identifiable Information includes, but is not limited to, Personal Information as that phrase is defined in M.G.L. c. 93H and 201 CMR 17.00: *Standards for the Protection of Personal Information of Residents of the Commonwealth*. Personally Identifiable Information may also include Confidential Information.

*Id.*

[54] 205 CMR, § 257.02(3)(e).

86. Relevant violations, injuries, harms, and damages are continuing, on-going, and/or increasing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. an Order certifying this action as a class action, appointing Plaintiff as class representative for the Class, and appointing his counsel to represent the Class;

B. an award of actual, compensatory, and/or consequential damages;

C. an award, or the return or refund, of all monies acquired by Defendant by means of any and all illegal, improper, wrongful, unjust, and/or inequitable practice(s), act(s), omission(s) and/or conduct involving or relating to the Model;

D. disgorgement of all amounts illegally, improperly, wrongfully, unjustly, and/or inequitably charged, collected, received, maintained, or held by Defendant involving or relating to the Model;

E. an award of statutory damages, as permitted by law;

F. an award of attorneys' fees and costs, and any other expense(s), including expert witness fees, as permitted by law;

G. an award of pre- and post-judgment interest on any amounts awarded;

H. injunctive relief prohibiting Defendant from using the Model to target users with extra e-mail, texts, online or in-app notifications, messages, incentives, and/or promotions to encourage them to keep gambling; and

I. such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 30, 2026

Respectfully submitted,

/s/Jason Leviton
Jason Leviton (BBO #678331)
Brendan Jarboe (BBO #691414)
**BLOCK & LEVITON LLP**
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
jason@blockleviton.com
brendan@blockleviton.com

Michael H. Sampson
(*Pro Hac Vice* Motion To Be Filed)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
(412) 253-4992
mike@lcllp.com

*Counsel for Plaintiff and the Proposed Class*